UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JANET ISASI,

*Plaintiff,*

– against –

THE DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, THE CITY OF NEW YORK BOARD OF EDUCATION, and ELAINE LINDSEY within her official capacity as Superintendent of the First and Twenty-Fifth School District(s),

*Defendants.*

**MEMORANDUM & ORDER**
21-cv-03298 (NCM) (JAM)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Janet Isasi brings this action against the New York City Department of Education, the New York City Board of Education, and Superintendent Elaine Lindsey for failure to accommodate her disabilities under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and for retaliation and discrimination on the basis of her religion and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Defendants have moved for summary judgment on all counts. *See generally* Mot.[1] For the reasons stated below, the motion for summary judgment is **GRANTED** in part and **DENIED** in part.

---

[1]    The Court hereinafter refers to defendants' Memorandum of Law in Support of their Motion for Summary Judgment ECF No. 106, as the "Motion"; plaintiff's Memorandum of Law in Opposition to Defendant's Motion, ECF No. 107, as the "Opposition"; and defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, ECF No. 109, as the "Reply."

## BACKGROUND

### I.    Factual Background[2]

This suit arises out of plaintiff's employment as Interim Assistant Principal of Instructional Support at Veritas Academy ("Veritas"), a New York City public school located in Queens, New York, from May 2018 through July 2019, and her subsequent employment by the New York City Department of Education ("DOE") in other roles. Plaintiff's Response to Defendants' Rule 56.1 Statement ("56.1 Resp.") ¶¶ 4, 9, ECF No. 110 (noting Veritas was a Queens North high school); Declaration of Janet Isasi ("Isasi Decl.") ¶ 6, ECF No. 108.

### A.    Plaintiff's background and hiring at Veritas

Plaintiff is a Jewish woman with a nearly 40-year tenure at the DOE. *See* 56.1 Resp. ¶¶ 1-2. She began as a substitute teacher and, in 2011, took a role as an Education Administrator. 56.1 Resp. ¶ 2. In Winter 2018, after a competitive hiring process, plaintiff was hired by Veritas's principal, Cheryl Quatrano, as Interim Assistant Principal of Instructional Support at Veritas. 56.1 Resp ¶ 3; *see* Isasi Decl. ¶ 8. The role was subject to a mandatory probation period. 56.1 Resp ¶ 4. Plaintiff was officially appointed on May 7, 2018. 56.1 Resp ¶ 4.

### B.    Plaintiff's coworkers and their discriminatory statements

At Veritas, plaintiff joined a team of other assistant principals that included Frank Raccuglia, the Assistant Principal of programming and security, 56.1 Resp. ¶ 5, and Deborah Kiernan, the Assistant Principal for math and ELA, 56.1 Resp. ¶ 6. Plaintiff found

---

[2]    The following facts, drawn from the parties' Local Civil Rule 56.1 Statements and evidentiary submissions, are undisputed unless otherwise noted.

statements made by members of that team, including Raccuglia and Kiernan, to be sexist, antisemitic, and racist. *See* 56.1 Resp. ¶¶ 5, 18.

i.    Statements in the Veritas group chat

In March 2018, a few weeks after plaintiff was hired at Veritas, Raccuglia started a group text chat with the vice principals and Quatrano, to communicate easily with one another. 56.1 Resp. ¶ 18; Deposition of Janet Isasi ("Isasi Transcript") 68:3–5, ECF No. 92-3. At some point, plaintiff was added to that group text chat as well. Isasi Tr. 68:1–2; 56.1 Resp. ¶ 18.

As of 2018, the DOE did not issue Veritas vice principals or principals phones, so the group chat was on the participants' personal devices. Isasi Tr. 68:6–13. However, even though the chat was on their personal phones, plaintiff understood that the purpose of the chat was to discuss work, and it was regularly used for that purpose. *See* Isasi Tr. 68:3–7; Isasi Decl. Exs. 8–11, ECF Nos. 99-8 to -11 (examples of texts sharing news about snow days; discussing misplaced school property; and preparing for an upcoming Quality Review).

Despite that work connection, multiple participants regularly sent personal memes to the chat. 56.1 Resp. ¶ 18. The memes shared were generally political, reflecting the vice principals' and Quatrano's strong support for President Donald Trump and distaste for Democrats and liberals. 56.1 Resp. ¶ 18. In addition to being political, though, many of the memes included statements and images that plaintiff found extremely discriminatory. 56.1 Resp. ¶ 22.

a.    Memes plaintiff found to be sexist

For example, between January and March 2019, members of the group sent multiple memes that plaintiff found highly sexist. One member of the chat sent a doctored

3

photo depicting President Joe Biden putting his hands on a woman's chest over her blouse. Opp'n. Ex. 12 at 2, ECF No. 107-12.[3] The photo's caption referred to Biden as "Gropey" and to Representative Alexandria Ocasio-Cortez, who was also pictured, as "Dopey." Ex. 12 at 2. Raccuglia also sent a cartoon depicting Ocasio-Cortez mostly naked (and removing the rest of her clothes), Opp'n Ex. 13 at 2, ECF No. 107-13, and a meme of Ocasio-Cortez and a man in a sombrero captioned "Mexican Word of the Day: Bishop" with the caption "Can someone please shut this bishop?!"—apparently wordplay for "shut this bitch up," Declaration of Shemori Corinthian ("Corinthian Decl.") Ex. G at 12 ("Shut the Bishop" meme), ECF No. 106-9. Raccuglia also sent a cartoon depicting Ocasio-Cortez with large breasts and a crop top with the words "socialism is sexy" across the chest, Corinthian Decl. Ex. G at 13, and a photo of her captioned, "I went to a mind reader, she charged me half price," Corinthian Decl. Ex. G at 19. Finally, Raccuglia also sent a meme that read "Blondes are now telling Alexandria Ocasio Cortez jokes." Corinthian Decl. Ex. G at 17.

b.    Memes plaintiff found to be antisemitic

Two memes that plaintiff found highly antisemitic were also shared in the group chat, one immediately after the other. One image showed a cartoon of Representative Nancy Pelosi standing next to Hitler, who was wearing a swastika. Corinthian Decl. Ex. G at 8. The cartoon version of Pelosi stated, "Sure, he's made some questionable comments about Jews, but I don't think it was intentional." Corinthian Decl. Ex. G at 8. The second image showed Representative Ilhan Omar laughing, with the caption, "I insult Jews and play dumb." Corinthian Decl. Ex. G at 8.

---

[3]    Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

4

c.    Other discriminatory memes

Finally, memes were shared in the chat that plaintiff found highly racist against both Black and Hispanic people. They included photos of a woman in blackface, Corinthian Decl. Ex. G at 18; memes mocking Bill Cosby and Jussie Smollett, Corinthian Decl. Ex. G at 11, 10; and a meme referring to Mexicans "[r]o[wing]" or "[w]ad[ing]" across a river. Opp'n Ex. 14 at 2, ECF No. 107-14.

d.    Plaintiff's perception of the targeted nature of the memes

From her first day at Veritas, plaintiff had declined to disclose any specific political group or affiliation to her coworkers, stating to Racculgia that she was "not political," hated politics, and did not intend to discuss politics in the workplace "at all." 56.1 Resp. ¶ 14; Isasi Tr. 28:21–24. Nevertheless, her coworkers made frequent comments about her perceived distaste for President Trump and the group's political memes. For example, on the evening of her first day, Quatrano had texted her that Racculgia "tells me you are not 100% behind Trump—this could be a true problem!" Opp'n Ex. 7 at 2, ECF 107-7. Next, on Principal Appreciation Day, Quatrano stated, "We all love Donald Trump... right, Janet?" referring to plaintiff, in front of other staff—an experience plaintiff found humiliating. 56.1 Resp. ¶ 16. Finally, when Racculgia sent the group thread a photo of himself in a "Make America Great Again" hat, Quatrano responded to the photo, "Janet, close your eyes." Corinthian Decl. Ex. G at 1. When plaintiff would fail to respond to a message in the group thread, other members of the thread would "would make fun" of her, asking, "Did you see the message I sent last night, Isasi?" Isasi Tr. 137:23–25.

The messages continued even though plaintiff repeatedly asked her coworkers to stop sending texts unless they were about work—and repeatedly asked Quatrano, their supervisor, to put a stop to the discriminatory messages. Isasi Tr. 83:6–18; Isasi Decl.

5

¶ 25. Plaintiff did not feel she could leave the group chat, despite her colleagues' refusal to stop sending such messages, because it was regularly used for work communications. Isasi Tr. 81:1–4.

With that context, plaintiff understood the memes generally and the sexist and antisemitic memes specifically to be targeted directly at her, both because of her coworkers' perception of her political feelings and because of her status as a woman and her Jewish faith. Isasi Tr. 155:11–14, 156:1–4. She found the Hitler meme specifically not only offensive but also intimidating, due to its depiction of Hitler and his swastika. 56.1 Resp. ¶ 18.

However, plaintiff also acknowledged that she was not the only Jewish or female member of the chat. Isasi Tr. 155:17–19. She believed that Quatrano, who was also a chat member, was Jewish as well. Isasi Tr. 155:17–19; *see also* Corinthian Decl. Ex. D (Deposition of Cheryl Quatrano ("Quatrano Tr.")) 125:24–25 (Quatrano identifying herself as a "white, Jewish woman"), ECF No. 106-6. She also acknowledged that Kiernan participated in the chat. Isasi Decl. ¶ 19 (noting that Kiernan had responded positively to both the cartoon of a mostly naked Ocasio-Cortez and to the "Shut this Bishop" meme).

ii.  Statements outside the group chat

Plaintiff also found some of her coworkers' comments outside of the group chat to be discriminatory.

For example, at school, Raccuglia asked multiple female staff members, including plaintiff, to rate their own appearances. Isasi Tr. 163:13–164:12; Isasi Decl. ¶ 22. At one point, he even recorded himself asking a female staff member in the office to rate herself on a scale from one to ten and sent that video to the group chat. Isasi Tr. 163:13–164:12. Plaintiff notes that Raccuglia made regular comments about how he "ran" his household

6

and how his wife had to be a "housewife" who made his lunches. Isasi Decl. ¶ 23. The declaration adds that whenever he was dissatisfied with those lunches, he would complain loudly about his wife to whoever was present. Isasi Decl. ¶ 23.

Plaintiff also heard Quatrano use the racist term "schvartze"[4] on multiple occasions to refer to students and other people of color. Isasi Decl. ¶ 24.

### C. Plaintiff's complaint to the Deputy Superintendent

In April 2019, plaintiff decided to bring her concerns about her coworkers' discriminatory statements, among other issues, to Deputy Superintendent Leticia Pineiro. She emailed Pineiro asking to speak about "something confidential." 56.1 Resp. ¶ 24. The next day, Quatrano "berated [her] without explanation, yelling and saying that there was 'something wrong with' her." 56.1 Resp. ¶ 24. The day after that, when plaintiff met with Pineiro, she learned that Pineiro had disclosed to Quatrano that plaintiff had scheduled a meeting with her. 56.1 Resp. ¶ 24. At that point, plaintiff understood Quatrano's episode the prior day to be a reaction to her scheduling the meeting in which she would disclose her complaints about the group chat to Pineiro. 56.1 Resp. ¶ 24.

During that meeting, plaintiff shared the offensive group chat text messages with Pineiro. 56.1 Resp. ¶ 24. Quatrano later testified that Pineiro subsequently "told [her] that she was offended by the texts." Quatrano Tr. 204:17–18. Pineiro advised plaintiff to file a complaint with the Office of Equal Opportunity and Diversity Management ("OEO") if she believed she was being discriminated against. 56.1 Resp. ¶ 25.

### D. Quatrano's criticism of plaintiff following her meeting with Pineiro

---

[4] *See* Schvartze, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/schvartze_n [https://perma.cc/YLW7-7JFL] ("slang, now offensive" for "a black person.").

Shortly after plaintiff's meeting with Pineiro, at Pineiro's instruction, Quatrano ordered Raccuglia to stop texting memes to the group chat. 56.1 Resp. ¶ 27. She also ordered plaintiff to stop texting, even though no one had suggested that plaintiff's own texts were offensive. 56.1 Resp. ¶ 27.

Former Veritas School Aide Natalie Bausone noted that around this time Quatrano called her and asked her to keep a written record of any complaints she had about plaintiff. Declaration of Natalie Bausone ("Bausone Decl.") ¶ 7, ECF No. 108-1. Plaintiff learned that other staff members were also asked to begin writing statements around the same time. Isasi Tr. 150:12–14.

Less than one week after plaintiff's complaint to Pineiro—and during Veritas's Spring Break week—Quatrano submitted a report to the DOE Office of Special Investigations ("OSI") raising allegations of multiple incidents of alleged verbal abuse by plaintiff that Veritas staff purportedly witnessed. *See* Corinthian Decl. Ex. I ("OSI Report"), ECF No. 106-11. However, after an investigation, OSI determined that the allegations were unfounded. *Id.* Nevertheless, Quatrano concluded that plaintiff had "exercised poor judgment" and issued her a verbal warning. 56.1 Resp. ¶ 37.

On May 6, 2019, about two and a half weeks after plaintiff raised her complaints with Pineiro, Quatrano also called plaintiff into a meeting with herself, Pineiro, and plaintiff's union representative to discuss plaintiff's performance. 56.1 Resp. ¶ 38. At that meeting, Quatrano raised a series of purported issues with plaintiff's performance, including issues noted in handwritten complaints from staff members. 56.1 Resp. ¶ 39; Corinthian Decl. Ex. Ex. K at 3, 7, 22, 24–28, ECF No. 106-13. All but one of the notes were dated after plaintiff's first meeting with Pineiro, and the vast majority were dated

8

May 1, just two days after Veritas staff returned from Spring Break. Corinthian Decl. Ex. K at 3, 7, 22, 24–28.

Following the meeting, plaintiff gave Quatrano a three-page single spaced letter rebutting her contentions, including 50 pages of supporting documents. 56.1 Resp. ¶ 41. Nevertheless, without responding to plaintiff's submission, Quatrano concluded that plaintiff "was insubordinate, exhibited subpar performance, and engaged in conduct unbecoming of her position." 56.1 Resp. ¶ 41. Quatrano added a letter memorializing her conclusions to plaintiff's file. 56.1 Resp. ¶ 41.

A second meeting, addressing additional purported issues, went similarly. 56.1 Resp. ¶ 44. Plaintiff again vehemently disagreed with the issues raised, providing Quatrano with a four-page single-spaced letter and more than a hundred pages of materials supporting her case. 56.1 Resp. ¶ 50. Quatrano again filed a letter documenting her criticisms shortly after the meeting, without responding to plaintiff's letter. 56.1 Resp. ¶ 50.

### E. Evidence of plaintiff's prior good performance

Quatrano's criticisms following the Pineiro meeting contrasted with other feedback about plaintiff's performance. For example, for at least the first several months of plaintiff's employment at Veritas, Quatrano was pleased with her performance, thanking her for her role in the success of the 2017–2018 school year, tacitly approving a glowing end-of-year review for that same year, and sending even more thanks for "go[ing] above and beyond" in connection with a positive Quality Review in Fall 2018. Opp'n Exs. 4–6, ECF Nos. 107-4 to -6.

9

Quatrano's criticisms also contrast with the assessment of former Student Aide Bausone, who spoke highly of plaintiff's interaction with coworkers and students. Bausone Decl. ¶¶ 4–5.

### F. Discontinuation of plaintiff's assistant principal position

On May 31, 2019, Quatrano completed plaintiff's evaluation for the entire 2018–19 school year. 56.1 Resp. ¶ 43. Quatrano gave her an overall unsatisfactory rating and recommended discontinuation of her probationary service. 56.1 Resp. ¶ 43.

On June 24, 2019, Superintendent Lindsey notified plaintiff that she would be reviewing whether to discontinue plaintiff's probationary service as Assistant Principal, based on that end-of-year review, letters to file, and other supporting documentation. 56.1 Resp. ¶ 57. In mid-July, plaintiff submitted a "voluminous" letter disputing Quatrano's assessment of her work performance for Lindsey's consideration. 56.1 Resp. ¶ 59. However, just a week after receiving plaintiff's letter, and without ever discussing the matter with plaintiff, Lindsey affirmed Quatrano's recommendation that she be terminated. 56.1 Resp. ¶¶ 59–60. In her subsequent deposition, Lindsey had virtually no memory of reviewing plaintiff's file. Deposition of Elaine Lindsey ("Lindsey Tr.") 43:5–10, 43:25–44:15, 77:15–80:12, ECF No. 106-8.

### G. Plaintiff's subsequent mental health issues and request for accommodation

Following the end of her role at Veritas, plaintiff remained at a reassignment center with no work for 40-hour weeks for approximately six months. 56.1 Resp. ¶ 61. By August 2019, she had developed severe mental health issues. She began receiving therapy for Major Depressive Disorder and a Panic Disorder with features of Post-Traumatic Stress Disorder. 56.1 Resp. ¶ 63.

At her deposition, plaintiff testified that her impairments impacted both her work and her personal life, affecting her ability to manage her family, perform everyday life skills, and socialize. 56.1 Resp. ¶ 63. A letter from plaintiff's psychiatrist also describes her experiencing "levels of anxiety that make it extremely difficult for her to work in person in a shared space." Corinthian Decl. Ex. Q, ECF No. 106-19.

Accordingly, when DOE administrators were called back into the office in July 2021, after a period of working from home due to the COVID-19 pandemic, plaintiff submitted a reasonable accommodation request to work from home. 56.1 Resp. ¶ 64. That request was granted through August 31, 2021. 56.1 Resp. ¶ 66. On August 19, 2021, plaintiff submitted another accommodation request to continue working from home. 56.1 Resp. ¶ 67. That request was denied, and plaintiff was called back into the office. 56.1 Resp. ¶ 68.

In her deposition, plaintiff testified that since returning to in-person work, she suffered intensely, requiring medication to make it through the day and interact with her supervisor. Isasi Tr. 131:1–11, 139:7–17.

## II.    Procedural History

On April 1, 2020, plaintiff filed an Charge of Discrimination and Retaliation to the Equal Employment Opportunity Commission ("EEOC"). 56.1 Resp. ¶ 69. The EEOC issued a right-to-sue letter, Compl. Ex., ECF No. 1-1, and on June 11, 2021, plaintiff commenced this action asserting, among other claims, an ADA failure-to-accommodate claim, related to the denial of her request to work from home; a Title VII retaliation claim, related to her termination following her complaint to Pineiro; and a Title VII hostile work environment claim, related to her coworkers' discriminatory texts and statements. Compl., ECF No. 1. Plaintiff filed the operative Second Amended

11

Complaint on December 13, 2021, again raising her failure-to-accommodate claim and Title VII retaliation and hostile work environment claims. Second Amended Complaint ("SAC"), ECF No. 35.

On July 26, 2022, the Court granted in part and denied in part defendants' motion, pursuant to FRCP 12(c) for a judgment on the pleadings. Order, ECF No. 54. Defendants now file for summary judgment on plaintiff's remaining claims, *i.e.*, her failure-to-accommodate, retaliation, and hostile work environment claims.

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021).[5] Facts are in genuine dispute when "the jury could reasonably find for" the non-moving party based on the evidence in the record. *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir 2021).

The movant "bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). Where the moving party meets their burden, the non-moving party must provide sufficient evidence establishing a genuine issue of material fact beyond "[t]he mere existence of a

---

[5] Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

scintilla of evidence." *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012). "A district court may not make credibility determinations, or weigh evidence" on summary judgment. *Reynolds v. Quiros*, 990 F.3d 286, 294 (2d Cir. 2021). Thus, a district court denies summary judgment where there are disputed facts "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## DISCUSSION

### I.    Disability under the ADA

The ADA was enacted to address the "day-to-day" experiences of people with disabilities and "provide a clear and comprehensive national mandate for the elimination of discrimination" against them. 42 U.S.C. § 12101(b). Under the ADA, discrimination includes an employer's failure to reasonably accommodate an individual with a disability. 42 U.S.C. § 12112(b)(5)(A).

Courts apply a burden-shifting framework to failure-to-accommodate claims. *Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021). First, plaintiffs must demonstrate a prima facie case, including the existence of some plausible accommodation through which they may perform the essential functions of the job. *McMillan v. City of New York*, 711 F.3d 120, 126–27 (2d Cir. 2013). To establish a prima facie case for failure to accommodate, a plaintiff must demonstrate that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [plaintiff's] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan*, 711 F.3d at 125–26; *see also Laguerre v. Nat'l Grid USA*,

13

No. 20-3901, 2022 WL 728819, at *1 (2d Cir. Mar. 11, 2022) (summary order). Where plaintiffs have made such a showing, the defendant must demonstrate that such an accommodation "would present undue hardships and would therefore be unreasonable." *McMillan*, 711 F.3d at 128.

Defendants here argue that plaintiff has failed to make out the first element of her prima facie case by failing to demonstrate that she is "disabled within the meaning of the ADA." *See* Mot. 14–16; Reply 7–11.

Specifically, defendants argue that plaintiff's diagnoses alone are insufficient to establish a disability under the ADA, and the record contains insufficient evidence that her disorders impair a "major life activity." Mot. 14–15. Plaintiff responds she has identified sufficient evidence that her Major Depressive Disorder and Panic Disorder with features of Post-Traumatic Stress Disorder impair her ability to engage in the major life activities of working and socializing with others. Opp'n 28–31.[6]

The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

---

[6]    Plaintiff also argues that EEOC regulations explicitly "identify disabilities like [hers] as substantially limiting major life activities." Opp'n 28 (citing 29 C.F.R. § 1630.2(j)(3)(iii)). It is true that the regulations explicitly identify "major depressive disorder" and "post-traumatic stress disorder" as examples of impairments that it "should easily be concluded . . . will, at a minimum, substantially limit" brain function. 29 C.F.R. § 1630.2(j)(3)(iii). However, defendants correctly observe that plaintiff has never explicitly argued that her brain function, specifically, has been substantially impaired. Reply 8. Given the analysis below, it is unnecessary for this Court to resolve (1) whether the EEOC regulations conclusively indicate that plaintiff was substantially limited with respect to her brain function and (2) whether plaintiff's lack of argument to that effect amounts to a waiver or forfeiture. Accordingly, the Court declines to consider either issue in further detail here.

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). With respect to the major life activity of working, courts in this district have held that "[a]n impairment 'substantially limits' [that activity] if an individual is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *O'Connor v. Huntington U.F.S.D.*, No. 11-cv-01275, 2014 WL 1233038, at \*12 (E.D.N.Y. Mar. 25, 2014) (quoting 29 C.F.R. § 1630.2(j)(3)). EEOC regulations—which provide persuasive authority here, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)—note that that assessment "usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v).[7]

Indeed, as the Second Circuit has explained, "the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021). First, the statute makes clear that the "determination of whether an impairment substantially limits a major life activity" must be made "without regard to the ameliorative effects of mitigating measures" such as medication, equipment, reasonable accommodations, or learned behavioral modifications. 42 U.S.C. § 12102(4). Further, EEOC regulations provide that for an impairment to be considered substantially limiting under the regulations, it "need not prevent, or significantly or severely restrict, the individual from performing a major life activity." *Id.* Instead, it need only "substantially limit[] the ability of an individual to

---

[7]    These regulations are not binding on the Court, but it is proper for the Court to consider them as persuasive authority. *See Loper Bright Enters.*, 603 U.S. at 394 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Accordingly, "the threshold issue of whether an impairment 'substantially limits' a major life activity" generally "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

Here—contrary to defendants' arguments, *see* Mot. 14–16—there is ample evidence in the record to suggest that plaintiff's conditions have substantially limited her major life activities of working and socializing.

*First*, a 2021 letter from plaintiff's psychiatrist clearly describes plaintiff experiencing "levels of anxiety that make it extremely difficult for her to work in person in a shared space." Corinthian Decl. Ex. Q.

*Second*, at her deposition plaintiff testified that her disorders "didn't just impact [her] workday." 56.1 Resp. ¶ 63. Indeed, she detailed that she "couldn't manage [her] family," "perform[] everyday life skills," or "attend[] to activities of daily living for [her]self or for [her] family." 56.1 Resp. ¶ 63. She testified that she "didn't want to see anybody" or "talk to anybody" and "became very reclusive," which caused "people to get upset when they [would] try and reach [her]" and she would not respond. 56.1 Resp. ¶ 63.

*Third*, plaintiff also testified that since returning to in-person work, she is "suffering every day" and "can't get through a day without medication and anxiety and panic pills." Isasi Tr. 130:16–18. "Going to work induces panic in every situation." Isasi Tr. 130:18–19. She reported that "[t]he panic attacks are probably the worst, and it's all triggered around work." Isasi Tr. 131:3–4. She recounts having "to carry anxiety medication with [her] for triggers at work." Isasi Tr. 131:4–5. Additionally, she explains that even though her relationship with her new boss was "professional . . . . it [did not]

16

matter" because "[e]very time he walk[ed] near [her], [she] start[ed] having a panic -- a panic attack." Isasi Tr. 139:7–12.

*Fourth*, in her Declaration in Opposition to Summary Judgment, plaintiff stated that she had to "tak[e] medication for psychological impairments that limit[ed] [her] ability to sleep, to leave the house, to socialize with friends, and even to relate to [her] family." Isasi Dec. ¶ 72. [8]

---

[8]    Defendants argue the Court should "decline to consider" these statements because they were not included in the SAC and were raised "for the first time in a declaration opposing summary judgment." Mot. 15 (citing *Sykes v. N. Fork Bank*, No. 07-cv-01102, 2009 WL 5042531, at *2 (E.D.N.Y. Dec. 16, 2009), and *Johns-Davila v. City of New York*, No. 99-cv-01885, 2000 WL 1725418, at *7 (S.D.N.Y. Nov. 20, 2000)). The Court is unconvinced by defendants' citations to *Sykes* and *Johns-Davila* for multiple reasons.

*First*, those cases are distinguishable, because contrary to defendants' argument, the SAC referenced impacted major life activities. The SAC incorporated by reference a letter from plaintiff's psychiatrist stating that plaintiff had "levels of anxiety that make it extremely difficult for her to work in person in a shared space"—a clear, albeit not explicit, reference to plaintiff's difficulty working and socializing. SAC ¶¶ 107–08; Corinthian Decl. Ex. Q. (To the extent that the statement includes references to other major life activities, like sleeping, plaintiff does not rely on those activities in her own arguments. *See* Opp'n 27–31.).

*Second*, "this case has by now moved well past the pleading stage" and "the factual viability of any legally cognizable claim asserted in the complaint . . . [now] rests on the force of the evidence . . . not on the sufficiency of the pleadings." *King-Devick Test Inc. v. NYU Langone Hosps.*, No. 17-cv-09307, 2019 WL 3071935, at *6 (S.D.N.Y. July 15, 2019); *see also Miller v. Lamanna*, 169 F.4th 118, 124 (2d Cir. 2026) (holding district court abused its discretion in applying pleading standard instead of summary judgment standard following discovery). Defendants' arguments that the SAC does not allege substantial impairments to major life activities are thus beside the point at this stage of the litigation. (And in any event, as noted above, ample evidence supports plaintiff's argument that her major life activities were substantially impaired.)

*Finally*, though defendants are "correct, as a general matter, that plaintiffs may not create material issues of fact by submitting affidavits. . . [t]he principle does not apply . . . if the statements are not actually contradictory [to the affiant's prior testimony], or the later sworn assertion addresses an issue that was not thoroughly or clearly explored." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014). Indeed, in *Devany v. United Parcel Service, Inc.*—a case relied upon by defendants, Reply 13—the court's decision not to consider plaintiff's declaration relied not on the fact that that declaration was belated but instead on the fact that it contradicted his earlier testimony. No. 18-cv-06684, 2021 WL 4481911, at *11 (S.D.N.Y. Sept. 30,

Defendants argue that that evidence at most demonstrates "a temporary period of withdrawal and embarrassment following the loss of employment, much like any other person would experience," Reply 9, and does not show that plaintiff is unable to socialize or to perform "a broad range of jobs in various classes, not merely a particular job," Reply 10 (citing *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020)). But viewed in the light most favorable to plaintiff, the evidence above suggests extensive and long-lasting impairments to work, socializing, and functioning within her household and daily life that defendants fail to acknowledge. Plaintiff's testimony makes clear that she has panic attacks *in her new role* when her supervisor walks by *even though she is medicated* and *even though she has a professional relationship with that supervisor*. Further, she testified that she was unable to communicate with friends, manage and relate to her family, or sometimes even leave the house due to her mental state. Whether those difficulties were initially caused by embarrassment or not, plaintiff's account of them could clearly support a finding that at least one, if not multiple, of plaintiff's major life activities has been impaired by her conditions.

Plaintiff's description of those impairments also readily distinguishes this case from *Woolf*, a case that defendants rely upon. Mot. 16. In that case, "[t]he record . . . demonstrate[d] that [plaintiff] believed he could perform the same job if he were transferred to a different location or if he were managed by different supervisors." 949

---

2021). Here, defendants do not suggest that plaintiff's declaration contradicts her testimony; they argue only that it includes additional information not present there or in the SAC. *See* Mot. 15; Reply 7.

Thus, the Court can properly consider the Declaration's statements in its analysis above.

F.3d at 94. Here, plaintiff has made clear that her conditions have persisted despite changes in her workplace, indicating the opposite.[9]

The Court is also unpersuaded by defendants' argument that plaintiff is able to perform a broad range of jobs because she has been able to perform her current role. Mot. 16. That argument flatly ignores plaintiff's testimony that she "can't get through a day [of in-person work] without medication and anxiety and panic pills." Isasi Tr. 130:16–18. Given that disability determinations explicitly must be "made without regard to the ameliorative effects of mitigating measures" such as medication, plaintiff's ability to perform her current work while medicated is not indicative of her disability status. 42 U.S.C. § 12102(4).

Accordingly, a jury could find based on evidence in the record that plaintiff is a person with a disability under the meaning of the ADA.

## II.    Retaliation Under Title VII

On a motion for summary judgment, Title VII retaliation claims are evaluated under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 458 (E.D.N.Y. 2025). A plaintiff must initially establish a prima facie case of retaliation by showing that "(1) she engaged in protected activity, (2) the defendant was

---

[9]    Defendants also rely on *O'Connor* for the proposition that "[a]n impairment substantially limits the ability to work only if it prevents an individual from performing a broad range of jobs in various classes as compared to the average person with similar training, skills, and abilities. Mot. 15–16 (citing *O'Connor*, 2014 WL 1233038, at *12). That case addressed whether the plaintiff was *perceived as* having a disability under the ADA, not whether he actually had a disability. *O'Connor*, 2014 WL 1233038, at *12–14. Thus, while the proposition for which it is cited is accurate, it is inapposite here, where defendants' assessment of plaintiff's disability is not at issue.

19

aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).

Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). When deciding a summary judgment motion as to a retaliation claim, in addition to considering alleged acts of retaliation on their own, courts must consider them in the aggregate, "as even minor acts of retaliation can be sufficiently substantial in gross to be actionable." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (quoting *Hicks*, 593 F.3d at 165).

If a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the alleged materially adverse action. *Carr*, 76 F.4th at 177–78. If it does so, the burden shifts back to the plaintiff, who must prove that the defendants' stated reason is pretextual. *Id.*

For a Title VII retaliation claim, a plaintiff must show that the "the retaliation was a 'but-for' cause of the employer's adverse action." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023). "[B]ut-for causation does not require proof that retaliation was the only cause of the action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Bostock v. Clayton County*, 590 U.S. 644, 656 (noting that but-for causation "can be a sweeping standard" and that "[o]ften, events have multiple but-for causes"); *Banks*, 81 F.4th at 275.

20

Defendants do not contest that plaintiff has made out a prima facie case based on her complaint to Pineiro and the subsequent discontinuation of her probationary role. Instead, they argue that they had legitimate, non-retaliatory reasons for the adverse actions taken against her. Mot. 18–20. Specifically, they assert that plaintiff exhibited a pattern of poor performance documented in her 2018–19 annual review and the multiple letters to file contained in the record, which were supported by documentary evidence and witness statements (including by witnesses who were not involved in the group text chat of which plaintiff complained). *See* Corinthian Decl. Exs. K–N, ECF Nos. 106-13 to -16. Defendants' description of plaintiff's poor performance include that plaintiff: (1) mishandled student interactions; (2) misused DOE databases; (3) directed paraprofessionals to perform clerical tasks instead of assisting students; (4) failed to ensure bilingual support for Spanish-speaking students as directed; (5) neglected mandated reports; and (5) failed to supervise teacher development. Mot. 19–20. Finally, they note that the decision to discontinue plaintiff's probationary position was made by Superintendent Lindsey, not Quatrano, and thus could not have been caused by any retaliatory intent on the part of Quatrano. Mot. 20.

In response, plaintiff vehemently disputes the validity of the allegations raised by defendants. She argues that significant evidence in the record demonstrates that those concerns were raised pretextually to disguise Quatrano's retaliatory intent and that the ultimate decisionmaker, Lindsey, was merely a "cat's paw" or conduit for Quatrano's retaliation. Opp'n 20–25.

Viewing the evidence in the light most favorable to plaintiff, a jury could conclude that the reasons given for discontinuing plaintiff's role were pretextual and that Quatrano's retaliatory animus was a but-for cause of plaintiff's termination.

### A. Evidence suggesting defendants' explanations for plaintiff's dismissal were pretextual

The crux of the dispute as to plaintiff's retaliation claim is whether there is a triable issue of fact as to whether defendants' non-retaliatory reasons for the adverse actions taken plaintiff are pretextual. The Second Circuit's decision in *Edelman v. NYU Langone Health System* is particularly instructive on the issue of pretext here. 141 F.4th 28, 50 (2d Cir. 2025). In that case, the plaintiff had raised complaints to a Human Resources representative about sexist statements by her site supervisor and another male coworker. *Id.* at 36. Following the complaints, the site director had instructed his direct report to "prepare a 'spreadsheet' and 'documentation' regarding purported 'issues' with [the plaintiff]." *Id.* at 50. As instructed, the office manager created a log. *Id.* Tellingly, the first data entry was made one day after plaintiff followed up with Human Resources about her complaints. *Id.*

The Circuit held that under those circumstances, the "circumstantial evidence support[ed] an inference that [the site manager] began collecting information with an eye toward ensuring that [the plaintiff's] contract would not be renewed" and that "[the site manager's] decision to provide this information to [the ultimate decisionmaker] was rooted, at least in part, in retaliatory animus." *Id.* Given that evidence, the Circuit explained, "[a] reasonable jury . . . could conclude – as th[at] jury did – that but for [the site manager's] collection of the information in the list," the plaintiff would not have been terminated. *Id.*

The evidence here—as presented by plaintiff—is similarly compelling. After Quatrano learned that plaintiff had scheduled a meeting with Piniero, plaintiff recounts, Quatrano "berated [her] without explanation, yelling and saying that there was

22

'something wrong with' her." 56.1 Resp. ¶ 24. Shortly after the complaint, Quatrano made a referral to OSI that was later determined to be unfounded. *See* OSI Report. And despite that finding, Quatrano still issued plaintiff a verbal warning. *See* OSI Report.

Moreover, similar to *Edelman*, after plaintiff's complaint to Piniero, Quatrano asked Veritas staff members to write down any complaints they had about plaintiff. *See* Bausone Decl. ¶ 7; Isasi Tr. 150:10–14. Indeed, all but one of the handwritten complaints Quatrano brought forward in the May 6 meeting were dated after plaintiff raised her complaint to Piniero. 56.1 Resp. ¶ 24. The vast majority were even dated with the same date (May 1). Corinthian Decl. Ex. K at 3, 7, 22, 24–28. And, given that Veritas's Spring Break ran from April 19 through April 28, that day was just three working days after plaintiff raised her complaint to Piniero. 56.1 Resp. ¶ 38. Thus, "based on the temporal proximity between [plaintiff's] complaints and [Quatrano's] efforts to compile issues with [her]," the jury could conclude that "[Quatrano's] decision to provide this information to [Lindsey] was rooted, at least in part, in retaliatory animus." *Edelman*, 141 F.4th at 50.

Additionally—contrary to defendant's arguments, Mot. 21—plaintiff relies on more than mere temporal proximity to support her claim. For example, plaintiff points to evidence that prior to her complaint to Piniero, Quatrano had repeatedly praised her performance. Opp'n Exs. 4–6. "[T]he fact that 'evaluations of the plaintiff post-dating the protected activity contradict earlier evaluations' may serve as evidence of pretext." *Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-cv-05612, 2012 WL 3646935, at *15 (E.D.N.Y. Aug. 22, 2012) (quoting *Ibok v. Securities Indus.*, 369 F. App'x. 210, 213 (2d Cir. 2010)).

Plaintiff also presents evidence that multiple of the complaints Quatrano raised addressed issues that (1) had already been resolved, (2) had been raised to Quatrano by plaintiff herself earlier in the year and gone unaddressed by Quatrano, or (3) fell within

23

another vice principal's purview. 56.1 Resp. ¶¶ 39, 41. Viewing each of these facts in the light most favorable to plaintiff, a reasonable jury could find that they support plaintiff's contention that defendants' non-retaliatory explanations are pretextual. Further, where a plaintiff has provided evidence that a supervisor was previously aware of and declined to address an issue, the supervisor's later "seiz[ing] on" that issue could demonstrate that the supervisor was merely searching for "a post-hoc rationale for terminating [plaintiff]." *Krause v. Kelahan*, Nos. 22-41(L), 22-288, 2025 WL 3466567, at *10 (2d Cir. Dec. 3, 2025). Thus, that evidence, too, could support a finding of prextext.

Accordingly, plaintiff's evidence supports a finding that defendants' proffered issues with plaintiff's performance were pretextual.

### B. *Evidence suggesting retaliatory animus was a but-for cause of the adverse action taken against plaintiff*

Defendants raise another challenge to plaintiff's retaliation claim. They point out that even if Quatrano had animus against plaintiff, she was not the individual that ultimately took an adverse action against plaintiff. Reply 8. Rather it was Lindsey who reviewed Quatrano's recommendation and plaintiff's objections, rejected plaintiff's arguments, and made the ultimate decision to discontinue plaintiff's probationary role. Reply 8. Thus, defendants argue, Lindsey's dispassionate assessment of plaintiff's performance, not Quatrano's alleged retaliatory animus, was the cause of plaintiff's termination. This argument is without merit.

As a general principle, "[a]ctions by an individual not involved in the adverse employment decision at issue do not give rise to an inference of discrimination." *Chang v. Safe Horizon*, No. 03-cv-10100, 2005 WL 2125660, at *7 (S.D.N.Y. Sept. 1, 2005). However, "the element of causation can be satisfied by showing that a person with

24

discriminatory animus toward the plaintiff influenced the actual decisionmaker, even if the latter did not consciously discriminate against the plaintiff." *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 515 n.10 (E.D.N.Y. 2018) (quoting *Sadki v. SUNY Coll. at Brockport*, 310 F. Supp. 2d 506, 513 (W.D.N.Y. 2004)).

Plaintiff has presented evidence by which a jury could find Quatrano's retaliatory animus was a "but-for" cause for the adverse action taken against her, even if Lindsey, the ultimate decisionmaker, did not have a retaliatory motive.

Here, there is evidence that Lindsey chose to uncritically credit the information provided by Quatrano in deciding to discontinue plaintiff's role. Lindsey affirmed Quatrano's recommendation that plaintiff be terminated just a week after receiving plaintiff's "voluminous" letter, with hundreds of pages of supporting materials, refuting the issues Quatrano had raised. 56.1 Resp. ¶¶ 59–60. And at her deposition, Lindsey had very limited memory of reviewing plaintiff's file. Lindsey Tr. 43:5–10, 43:25–44:15, 77:15–80:12. A jury could reasonably conclude from those facts that Lindsey had made "only a very limited inquiry" into Quatrano's information before acting on it. *Edelman*, 141 F.4th at 50 (holding plaintiff had shown retaliatory intent based on ultimate decision-maker's limited inquiry into complaints against plaintiff). And it could further conclude that "the information compiled by [Quatrano] became the entire case against [plaintiff] when [Lindsey] chose to credit only th[at] information" in deciding to discontinue plaintiff's role—making Lindsey a mere "conduit" of Quatrano's retaliatory animus. *Id.* That would be sufficient to show causation here.

Thus, viewing this evidence in plaintiff's favor, a jury could conclude that Quatrano's retaliatory animus was a but-for cause for the adverse action taken against plaintiff, even though Quatrano was not the ultimate decisionmaker.

25

*    *    *

Accordingly, plaintiff has raised triable issues of fact as to whether defendants' explanations for the discontinuation of her role are pretextual and whether her complaint to Piniero was a "but-for" cause of the adverse action taken against her.

### III.    Hostile work environment under Title VII

"To establish a hostile work environment under Title VII . . . a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015). "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321.

In order for the conduct to be deemed pervasive, the "incidents must be more than episodic" and instead must "be sufficiently continuous and concerted." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). Nevertheless, a single incident can create a hostile environment where it is so severe that it results in a "transformation" of the plaintiff's workplace based on the plaintiff's protected characteristics. *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). However, the Second Circuit has held that "[a] single incident must be extraordinarily severe to support a hostile work environment claim"—

26

though it "need not involve an actual or threatened physical assault." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 263 (2d Cir. 2023).

When evaluating whether a workplace is hostile, courts must consider "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Courts are instructed to evaluate those factors "cumulatively" and "to consider the totality of the circumstances." *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 74 (2d Cir. 2023).

They are also admonished to remember that "Title VII does not establish a 'general civility code' for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Thus, "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment," *Petrosino*, 385 F.3d at 223, nor will "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," *Redd*, 678 F.3d at 177.

Critically, to establish a hostile work environment claim under Title VII, a plaintiff must also show some connection between the hostile or abusive conduct and a protected characteristic. *See Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015); *Parekh v. Swissport Cargo Servs., Inc.*, No. 08-cv-01994, 2009 WL 290465, at *4 (E.D.N.Y. Feb. 5, 2009) ("[T]he incidents comprising a hostile work environment claim . . . must occur under circumstances in which the incidents can reasonably be interpreted as having taken place on the basis of that trait[.]").

Defendants argue that the record here "contains no evidence that Plaintiff was subjected to a hostile or abusive work environment because of her gender or religion" and that "the challenged conduct . . . was neither objectively severe nor pervasive and,

27

certainly, not motivated by Plaintiff's gender or religion." Mot. 9. Plaintiff responds that (1) the sending of the Hitler meme alone was sufficiently severe to support a finding that her workplace was hostile on account of her religion and (2) the sexist memes and Raccuglia's comments, in combination with the broader discriminatory environment, are sufficiently severe and pervasive to support a finding that her workplace was hostile on account of her gender. Opp'n 13–18.

### A. Religion-based hostile work environment

Plaintiff has presented evidence of two memes, shared via text message in her work group text chat, that she argues supports her hostile work environment claim based on her religious protected characteristic. Specifically, plaintiff argues that the Hitler meme (and, to a lesser extent, the meme with Representative Omar), is severe conduct that she also felt was threatening.

Evaluating the totality of the circumstances, plaintiff has failed to raise a triable issue as to whether the Hitler meme was "extraordinarily severe" to the point that it resulted in a "transformation" of plaintiff's workplace on the basis of her religion. At face value, the meme is not physically threatening or humiliating towards Jewish people—rather, it mocks the sender's perception of *Representative Pelosi's* lack of support for them. Corinthian Decl. Ex. G at 8. The other meme that mentions Judaism is similarly critical of Omar's perceived "insult[s]" toward Jewish people. Corinthian Decl. Ex. G at 8. Indeed, Raccuglia, had repeatedly and vociferously expressed disdain for Democratic politicians like Pelosi and Omar throughout his texts to the group chat. *See generally* Corinthian Decl. Ex. G. He even sent a second meme mocking Pelosi specifically. *See* Corinthian Decl. Ex. G at 12 (depicting Justice Brett Kavanaugh saying, "Hey Nancy, remember me?"). Additionally, while not dispositive, a jury would have to consider that

28

Raccuglia sent the Hitler and Omar memes to a group that included his Jewish supervisor—not just his Jewish coworker. With that context, and without additional evidence of antisemitic conduct by Raccuglia or plaintiff's other coworkers, no reasonable jury could conclude that the Hitler meme (with or without the Omar meme) created a severely hostile workplace environment based on plaintiff's Judaism.

To be clear, the Court is not holding here that "one swastika is not enough" or that a coworker or supervisor's display of deeply offensive, historically freighted imagery in a workplace cannot sustain a Title VII claim. Courts in this circuit have held that even brief displays of that kind can create sufficiently severe hostility under Title VII and comparable state statutes. *See, e.g.*, *Williams v. New York City Hous. Auth.*, 154 F. Supp. 2d 820, 823 (S.D.N.Y. 2001) (under Title VII, display noose in a supervisor's office for three days was sufficiently severe to create a hostile work environment because that symbol was inherently intimidating/threatening, given its historical context); *Orlando v. BNP Paribas N. Am., Inc.*, No. 14-cv-04102, 2015 WL 6387531, at *17 (S.D.N.Y. Oct. 22, 2015) (under New York State Human Rights Law, hostility was supported by a video depicting a competitor company as the Third Reich, complete with swastikas, that was shown to plaintiff and his coworkers and then shown once more over plaintiff's vehement objections).

However, it is in the consideration of the totality of the circumstances, in which the Court must engage, where plaintiff fails to establish an adequate severe circumstance. Indeed, in *Orlando*, the main case cited by plaintiff on this point, the court relied on more than just the display of swastikas and Nazi imagery in the video. 2015 WL 6387531, at *17. It explained that the plaintiff had also "testified at his deposition that his colleagues made

29

a number of anti-Semitic comments during his tenure" at his workplace, indicating that "the Hitler video was not played in a vacuum." *Id.*

Accordingly, plaintiff has not raised a triable issue of fact by which a reasonable jury could find that she has established a hostile environment claim based on religion.

### B. Gender-based hostile work environment

Plaintiff has also failed to raise a triable issue of fact with respect to her gender-based hostile environment claim. To support that claim, she points to the arguably sexist memes sent into the group chat and various statements made by Raccuglia—namely his habit of asking female coworkers to rate their own appearances and of commenting about his patriarchal relationship with his wife.[10] Opp'n 14. Evaluating the totality of the circumstances, plaintiff has failed to raise a triable issue as to whether those images and statements, individually or collectively, created a workplace so "permeated with [sexist] intimidation, ridicule, and insult" that it was "sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment." *Littlejohn*, 795 F.3d at 320–21.

First, to address the memes: plaintiff emphasizes the images that "cit[ed] a phrase for 'bitch' . . . and highlight[ed] women's breasts." Opp'n 16. With respect to the use of "a phrase for 'bitch,'" the Second Circuit has rejected any rule that would make the use of

---

[10]    Defendants note that the latter statements appear for the first time in plaintiff's Declaration in Opposition to Summary Judgment and accordingly urge this Court to disregard them. Reply 13 (citing *Devany*, 2021 WL 4481911, at *11). However, as explained above, *supra* note 8, a party may rely on such declarations "if the statements [in them] are not actually contradictory [to the affiant's prior testimony]" or if "the later sworn assertion addresses an issue that was not thoroughly or clearly explored" in discovery. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213 (2d Cir. 2014). Here, defendants do not suggest that plaintiff's declaration contradicts her testimony; they argue only that it includes additional information not present in her complaint or deposition testimony. *See* Reply 13. Thus, the Court can and will consider the statements at issue here.

that word in the workplace a categorical indication of a hostile work environment. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010). And courts within this Circuit "have regularly concluded that the occasional use of that term is not severe enough to create a hostile work environment." *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 265–66 (E.D.N.Y. 2019) (collecting cases).

In *Beale v. Mount Vernon Police Dep't*, for example, the court held that the plaintiff, a police officer, overhearing her supervisor refer to a female attorney as a "bitch" was insufficient to sustain a gender-based hostile work environment claim. 895 F. Supp. 2d 576, 589 (S.D.N.Y. 2012). And, perhaps even more tellingly, other courts have held that it was insufficient when a coworker called *the plaintiff* a "bitch." *La Marco v. N.Y. State Nurses Ass'n*, 118 F. Supp. 2d 310, 317-18 (N.D.N.Y. 2000) (defendant's use of the term "bitch," in conjunction with other gender-neutral offensive conduct, was not enough to establish a sex-based hostile work environment). Thus, here, a single use of the term, directed at someone other than plaintiff, did not alter the conditions of plaintiff's employment.

The images "highlighting women's breasts" also fall short. "[T]he display of pictures of naked people can, of course and depending on the context or circumstances, create a hostile working environment based on sex." *Sherman v. Fivesky, LLC*, No. 19-cv-08015, 2020 WL 2136227, at *12 (S.D.N.Y. May 5, 2020) (collecting cases). "But the circumstances in which they do so are ones where they 'create[ ] a working environment that [is] hostile to [the plaintiff] on the basis of [the plaintiff's membership in a protected class],' *i.e.*, where the content of the material victimizes the recipient." *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000)). For example, courts have found gender-based hostile work environments based on the intra-workplace transmission of

31

images that superimposed the plaintiff's face on nude bodies. *See, e.g., Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16-cv-04779, 2017 WL 2345658, at *1 (E.D.N.Y. May 30, 2017); *Ruiz v. City of New York*, No. 14-cv-05231 VEC, 2015 WL 5146629, at *9 (S.D.N.Y. Sept. 2, 2015). Further, the sharing or displaying of pornographic images in the workplace has also supported an inference of a hostile work environment at the summary judgment stage. *See Legg v. Ulster Cnty.*, 979 F.3d 101, 115 (2d Cir. 2020) (holding "the pervasive presence and use of pornographic magazines and screensavers (including by supervisory officers), sexual comments made by various officers about [a plaintiff's] body, and the several specific incidents" involving a coworker staring at the plaintiff, breathing on her, and simulating sexual pleasure in front of her supported plaintiff's hostile work environment claim).

However, the Second Circuit has held that not all nude or semi-nude images in the workplace give rise to a sex-based hostile work environment claim. In *Brennan v. Metro. Opera Ass'n, Inc.*, for example, it held that a prolonged display of photos of nude and partially clothed men in a shared office did not constitute a hostile work environment. 192 F.3d 310, 319 (2d Cir. 1999). In that case, the pictures and one instance of unwelcome sexual banter were the only evidence for plaintiff's sex-based claim. *Id.* The Circuit explained that "while arguably offensive, the pictures and banter could not reasonably be characterized as physically threatening or humiliating" and thus could not sustain the plaintiff's hostile work environment claim. *Id.*

Here, as in *Brennan* and unlike in *Gallager* or *Ruiz*, none of the images depict or purport to depict plaintiff. Additionally, unlike in *Legg,* none of the images are pornographic or sexual. Closest to the line is the meme of President Biden groping a fully clothed woman's chest, and, as with the Hitler meme discussed above, that is clearly a

32

meme *criticizing* Biden for his perceived "[g]ropey"-ness—not celebrating or supporting it. Thus, even with these images grouped together, it is hard to see how they could be considered "physically threatening or humiliating" to plaintiff as a woman or how they could constitute "material [that] victimizes" her on the basis of her gender (as opposed to, say, her politics).[11] That conclusion is further reinforced by the fact that Raccuglia sent the memes to a group chat that included multiple other women, including his supervisor, and that at least one of those women reacted positively to his messages. Isasi Decl. ¶ 19 (noting that Kiernan had responded positively to both the cartoon of a mostly naked Ocasio-Cortez and to the "Shut this Bishop" meme).

Nor do Raccuglia's requests that his coworkers rate their own appearances or his comments about his wife move the needle. Though courts in this Circuit have pointed to instances of male workers rating or commenting on their female coworker's appearances as part of broader findings of gender-based hostility, in such cases, the rating has been only one element of a broader hostile environment. *See, e.g.*, *Pascal v. Storage Tech. Corp.*, 152 F. Supp. 2d 191, 209 (D. Conn. 2001) (constant use of offensive and sexually explicit language by plaintiff's coworker, sexually explicit discussions about other female employees in her presence, a photograph targeting her in a sexualized manner, and a plaque containing a sexual joke, all in the context of a predominantly male environment and following plaintiff's complaints about such conduct amounted to a hostile

---

[11] The same is true of the "dumb blonde" meme, which read, "Blondes are now telling Alexandria Ocasio-Cortez jokes." Corinthian Decl. Ex. G at 17. Though arguably sexist, in the broader context of the chat, which included a host of memes mocking Ocasio-Cortez, a reasonable jury could not find that that meme evinced hostility *based on gender*.

33

environment).[12] Here, in contrast, plaintiff points to no evidence that Raccuglia ever made sexually explicit comments; that he offered his own assessment of his coworkers' appearances; or that other male coworkers joined in his commentary. Further, plaintiff never explains how Raccuglia's statements and complaints about his own marriage could alter the terms of plaintiff's employment. Thus, while Raccuglia's comments were arguably inappropriate for the workplace, no reasonable jury could find that they created a hostile environment on the basis of gender.[13] Accordingly, plaintiff has failed to raise a triable issue of fact on her gender-based hostile environment claim as well.

## CONCLUSION

For the reasons stated above, summary judgment is **DENIED** as to plaintiff's ADA failure-to-accommodate and Title VII retaliation claims and **GRANTED** as to plaintiff's Title VII hostile work environment claim. In accordance with the Court's Individual Practice Rule IV.A, the parties shall file a proposed joint pretrial order by August 26, 2026.

---

[12] Plaintiff also points to *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013), which found a hostile environment where men in the office "objectified women by openly viewing and sharing pornography, discussing their jaunts to strip clubs, rating the female employees' appearances, and making lascivious comments about women's outfits and bodies." However, that case applied the New York City Human Rights Law, for which state courts have declined to use the federal "severe and pervasive" standard and instead have applied a more permissive standard. *Id.* at 110.

[13] Plaintiff also urges the Court to consider the allegedly racist comments and nondiscriminatory conduct of her coworkers as part of the "overall hostility of the working environment." Opp'n 15 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). However, because the Court has concluded that plaintiff's claim lacks the required nexus to her religion and gender, it fails regardless of the degree of hostility she experienced.

**SO ORDERED.**

_/s/ Natasha C. Merle_
NATASHA C. MERLE
United States District Judge


Dated:         July 27, 2026
               Brooklyn, New York